# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LYNETTE BARRETT,                   )
EUGENE JULIEN,                 )
WT MELTON,                     )
TREVA NICKENS,                 )
LARRY SCHUSTER,              )
and DIANA SIMMONS,         )
                                 )
      Plaintiffs,                )
                                 )
v.                                     )     **Case No. 3:06-cv-0017**
                                 )     **Judge Trauger**
WHIRLPOOL CORP.,              )
                                 )
      Defendant.              )

## MEMORANDUM

Pending before the court are motions for summary judgment filed by the defendant, Whirlpool Corp., against the plaintiffs Lynette Barrett, WT Melton,[1] and Treva Nickens (Docket Nos. 122, 128, and 134, respectively), to which those three plaintiffs have responded (Docket Nos. 156, 154, and 153, respectively), and the defendant has replied (Docket Nos. 167, 170, and 173, respectively). Also pending are motions for summary judgment filed by the defendant, Whirlpool Corp., against the plaintiffs Eugene Julien and Larry Schuster (Docket Nos. 111 and 105, respectively), which have not been opposed.[2] For the reasons discussed herein, the motions

---

[1]The plaintiffs have consistently omitted the periods after this plaintiff's first and middle initials, so the court will do likewise.

[2]At this time, there is no motion for summary judgment pending as to claims asserted by Diana Simmons.

1

for summary judgment[3] as to the claims asserted by plaintiffs Lynette Barrett, WT Melton, Treva Nickens, Eugene Julien, and Larry Schuster will be granted.

## FACTUAL BACKGROUND[4]

The plaintiffs are all Caucasian employees of the defendant, Whirlpool Corp. ("Whirlpool"), and work or worked[5] at a Whirlpool facility in La Vergne, Tennessee (the "La Vergne Facility" or the "Facility"). The plaintiffs complain that the La Vergne Facility was permeated by an atmosphere in which white workers openly and frequently used racist slurs and made racist jokes and comments and that such conduct was tolerated by Whirlpool supervisors and managers. The plaintiffs further allege that black workers were treated differently than white workers, in that they were subject to more demanding performance standards and demeaning treatment by supervisors and managers. The plaintiffs claim that, unlike many of their white co-workers, they maintained friendships with their black co-workers and found the

---

[3]The defendants' motions for summary judgment were filed while the plaintiffs' Third Amended Complaint was the operative complaint. Subsequently, the plaintiffs were granted leave to amend their complaint a fourth time. In seeking leave to amend their complaint a fourth time, the plaintiffs represented that the purpose of that amendment was solely to reincorporate the allegations of Diana Simmons, which were present in the Second Amended Complaint but had been removed in the Third Amended Complaint, and that "the factual allegations and legal theories in Plaintiff's proposed Fourth Amended Complaint are identical to those contained in Plaintiffs' Second Amended Complaint." (Docket No. 120 at 4.) As filed, however, the Fourth Amended Complaint is inconsistent with the plaintiffs' representations in that the complaint adds duplicative claims on behalf of Simmons and Schuster, deletes a retaliation claim on behalf of Barrett, and fails to assert a Section 1981 claim on behalf of Simmons. (Docket No. 149.) Regardless, as the motions for summary judgment presently before the court address the claims as stated in the Third Amended Complaint, any inconsistencies in the Fourth Amended Complaint do not affect the issues presently before the court.

[4]To the extent that the parties have made specific factual allegations with regard to each plaintiff's particular claims, those allegations will be discussed in detail in Section II *infra*.

[5]Melton no longer works at Whirlpool as of July 2007, Nickens no longer works at Whirlpool as of January 2007, and Schuster no longer works at Whirlpool as of May 2004.

2

racist atmosphere in the Facility offensive. As a result, they declined to engage in or condone the racist conduct that they observed, and they objected to such conduct by confronting the responsible individuals and complaining to supervisors and managers.

According to the plaintiffs, however, their complaints did not change the atmosphere prevalent at the facility. Instead, because of their complaints and their friendships with their black co-workers, the plaintiffs contend that they were ostracized, shunned, and harassed by their white co-workers. They also allege that they were subject to retaliation as a result of their actions. The plaintiffs each filed charges with the Equal Employment Opportunity Commission (the "EEOC"), and they now bring this suit alleging that they were subject to a hostile work environment in violation of Title VII and Section 1981 and that they were subject to retaliation in violation of Title VII. They seek declaratory and injunctive relief, as well as damages, back pay, and attorneys' fees.

## ANALYSIS

### I.     Legal Background

#### A.     *Statutes of Limitations*

For a Title VII claim to be considered timely, a plaintiff must file a charge with the EEOC within three hundred days of the allegedly discriminatory act. 42 U.S.C. § 2000e-5(e)(1). The statute of limitations for a Section 1981 claim, by contrast, is four years. 28 U.S.C. §1658(a); *Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369, 382 (2004).

Hostile work environment claims, which the plaintiffs here assert under both Title VII and Section 1981, involve "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002);

3

*Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (stating that hostile work environment claims "involve unlawful employment practices that cannot be said to occur on any particular day, but occur over a series of days"). As such, a hostile work environment claim is timely so long as the plaintiff files her EEOC charge within three hundred days of any single act contributing to the hostile work environment. *Morgan*, 536 U.S. at 117. It is irrelevant if some acts contributing to the hostile work environment occurred prior to the limitations period, and such prior acts may be considered in evaluating the claim. *Id.* By contrast, claims based on discrete acts of discrimination—such as retaliation claims under Title VII, which are also alleged by the plaintiffs here—are timely only if the particular alleged retaliatory act occurred during the three-hundred-day period prior to the plaintiff's filing the EEOC charge.[6] *Id.* at 113 ("[D]iscrete

---

[6]Historically, the continuing violations doctrine permitted a plaintiff to recover for discrete acts occurring outside the limitations period by demonstrating either that the defendant engaged in a series of discrete violations or that the defendant engaged in a longstanding and demonstrable policy of discrimination. *See Sharpe*, 319 F.3d at 266. In *Morgan*, however, the Supreme Court rejected the serial violations method of proving a continuing violation, and, consequently, a plaintiff may only prove a continuing violation by demonstrating a policy of discrimination. 536 U.S. at 113. Addressing *Morgan*, the Sixth Circuit stated:

> *Morgan* overturns prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period. The second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by *Morgan*.

*Sharpe*, 319 F.3d at 268; *see also Kinamore v. EPB Elec Ulti.*, 92 Fed. Appx. 197, 206 (6th Cir. 2004) (stating that "[w]ith respect to run-of-the-mill retaliation claims" only a showing of a longstanding and demonstrable policy of discrimination "may be used to avoid the customary rule that the limitations period begins to run with each discriminatory act."). To establish a longstanding and demonstrable policy of discrimination on the part of the defendant, a plaintiff must demonstrate that "some form of intentional discrimination . . . was the company's standard operating procedure." *Sharpe*, 319 F.3d at 269 (quotation and citation omitted).

4

discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

       *B.*     *Racial Discrimination Claims*

A plaintiff may prove a claim of discrimination through either direct evidence of discrimination or circumstantial evidence that supports an inference of discrimination.[7] *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Where the plaintiff's proof is based on circumstantial evidence of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applied. Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff carries that burden, the burden shifts to the defendant, who must present a legitimate, non-discriminatory reason for its actions. *Id.* at 802-03. If the defendant does so, the plaintiff must then show that the legitimate, non-discriminatory reason proffered by the defendant was in fact merely a pretext for discrimination. *Id.* at 804.

       1.     Hostile work environment

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). To establish a *prima facie* case of a racially hostile work environment under Title VII, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work

---

      [7]Claims of racial discrimination brought under Title VII and Section 1981 are subject to the same analysis according to the same standards. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

5

performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

It is not necessary, however, for a plaintiff to demonstrate "strict membership" in a protected class to prevail on a Title VII claim. *Wanchick v. Great Lakes Health Plan, Inc.*, 6 Fed. Appx. 252, 266 (6th Cir. 2001). Title VII protects not only individuals who themselves are members of a protected class, but also those individuals who, though not members of a protected class, are nevertheless "victims of discriminatory animus toward third persons with whom the individuals associate." *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999). Thus, individuals who are not members of a protected class may pursue a Title VII claim if they were discriminated against either on the basis of their association with protected class members, *see id.* at 994, or on the basis of their advocacy on behalf of protected class members, *see Johnson*, 215 F.3d at 575; *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977) (holding that Section 1981 provides a cause of action for a white individual who allegedly was fired as a result of advocacy on behalf of a black co-worker). In this case, none of the plaintiffs claims to be a member of a protected class. Instead, the plaintiffs assert claims on the basis of their association with, and advocacy on behalf of, their black co-workers.

To establish a hostile work environment, a plaintiff must demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation and quotation omitted). Courts determining whether a hostile work environment exists must look to the totality of the circumstances, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510

6

U.S. at 23), including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Morgan*, 536 U.S. at 116 (citation omitted). The test is both subjective and objective; the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. Under the totality of the circumstances approach, a district court must "consider harassment by all perpetrators combined" and "[keep] in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Williams v. Ford Motor Co.*, 187 F.3d 553, 562-63 (6th Cir. 1999) (quotation and citation omitted); *see also Jackson v. Quanex*, 191 F.3d 647, 659-60 (6th Cir. 1999).

　　　　2.　　　　Retaliation

Title VII additionally provides that it is unlawful for an employer to discriminate against an employee because the employee has "opposed any [unlawful employment practice]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this title." 42 U.S.C. § 2000e-3(a). A plaintiff who asserts that she opposed an employer's unlawful actions must demonstrate that her opposing activity was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII. *See Johnson*, 215 F.3d at 579. Additionally, the act of opposing must be active and consistent, *see Bell v. Safety Grooving & Grinding, LP*, 107 Fed. Appx. 607, 610 (6th Cir. 2004), although a plaintiff who complains about an employer's unlawful practices has engaged in opposing activity regardless of whether those complaints were directed to the employer's management, a union, a newspaper, or other employees, *see Johnson*, 215 F.3d at 579-80.

To establish a claim of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in an activity protected by the statute; (2) the exercise of her protected rights was known by the defendant; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000); *Johnson*, 215 F.3d at 578. In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action. *See Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999).

## II.    Contested Motions for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh

8

the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

A.    *Lynette Barrett*

Barrett has been employed by Whirlpool at the La Vergne Facility from approximately October 2004 through the present. She alleges that, on numerous occasions during the course of her employment, she witnessed white employees using racial slurs and epithets and making racially offensive jokes and comments, and she observed the presence of racist graffiti. Specifically, Barrett alleges that, in July 2006, she observed graffiti consisting of the acronym

9

"KKK" and the image of a noose on a cart used by a black maintenance worker. (Docket No. 156 at 3.) Though she complained about this incident to a supervisor, no one was disciplined for the incident. (Docket No. 156 at 7-8.) She also observed racist graffiti in a rest room in approximately 1996. (Barrett Dep. at 54.) Additionally, in 2001 or 2002, Barrett claims that she heard a white co-worker disparage Martin Luther King, Jr. Day and advocate for "James Earl Ray Day." (Docket No. 156 at 3). Though she complained about this to a supervisor, nothing was done to address her complaints. (Docket No. 156 at 7.) Barrett also alleges that black workers were treated differently than white workers and that during weekly department meetings a white manager would refuse to sit next to or talk to Lisa Majors, one of Barrett's black co-workers. (Docket No. 156 at 4.) According to Barrett, though she complained about this behavior to a supervisor, nothing was done to address her complaints. (Docket No. 156 at 6.)

Barrett also claims that she repeatedly heard Dale Travis, a white worker, use the word "nigger" to refer to black workers during Travis's employment from January 1990 through November 2003. (Docket No. 152 Ex. A ¶ 7.) In "approximately 2000," Barrett heard Travis refer to a black worker who had received a promotion as an "uppity nigger." (Docket No. 156 at 5.) According to Barrett, she complained about this comment to a supervisor, but no action was taken as a result of her complaint. (Docket No. 156 at 5.) Barrett also alleges that she heard Travis tell a racial joke that referenced "a Catholic, a Jew, and a nigger," and that a supervisor who heard the joke did nothing to stop or prevent such behavior. (Docket No. 156 at 4.) In August 2001, Barrett heard Travis state, with regard to a particular black worker, that "the nigger bitch is going to get what's coming to her." (Docket No. 156 at 4.) Again, Barrett complained about this comment to a supervisor, but was told to return to work and "leave it alone." (Docket No. 156 at 5-6.) Barrett confronted Travis herself, and he responded by informing her that he

"had a nine-millimeter [gun]." (Docket No. 156 at 6.) Barrett alleges that, because of this incident, she feared for her safety if she complained further about Travis's racist conduct. She also claims that, though Whirlpool's management and Human Resources department knew of Travis's harassing behavior, he was never subject to discipline. (Docket No. 156 at 7.)

According to Barrett, she was friends with a number of her black co-workers, and she assisted some of her black co-workers by helping them prepare their resumes and recommending them for promotion. She claims that, because of these friendships and because she refused to participate in racist conduct and complained about such conduct,[8] her white co-workers gave her the "cold shoulder," "shun[ned] her," gave her "dirty looks," and refused to speak to her. (Docket No. 156 at 5.) Barrett also claims that she received unfavorable job assignments in retaliation for her actions. (Docket No. 156 at 8.)

      1.     Statutes of limitations

The defendant claims that Barrett's claims are untimely. Barrett filed a charge with the EEOC on August 11, 2005 and filed the complaint in this action on January 10, 2006. Thus, her Title VII hostile work environment claim is timely if any of the incidents that contribute to the allegedly hostile work environment occurred within three hundred days prior to the EEOC filing, or after October 15, 2004, and her Section 1981 hostile work environment claim is timely if any of the contributing incidents occurred within four years prior to her filing the complaint, or after

---

[8]In addition to making complaints to supervisors, Barrett asserts that she asked a union representative about filing a grievance regarding the racially harassing environment at the La Verge facility but that he never responded to her inquiry. (Docket No. 156 at 8.) Additionally, Barrett claims that Whirlpool's Human Resources department did not redress complaints about the environment at the Facility and rather "ignored or exacerbated the problem." (Docket No. 156 at 8.)

11

January 10, 2002.  Additionally, her Title VII retaliation claim is timely if the allegedly retaliatory action occurred after October 15, 2004.

While a hostile work environment encompasses a series of events, and events outside the limitations period may be considered in evaluating a claim, a plaintiff must allege that some event contributing to the hostile work environment occurred within the limitations period for the claim to be timely.  *Morgan*, 536 U.S. at 117 ("Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of liability.").  Barrett argues that her hostile work environment claims are timely because racist graffiti and "open discrimination" against blacks continues at the La Vergne Facility "to this day."  (Docket No. 156 at 23.)  Barrett also indicated in her affidavit that she heard white co-workers use the term "nigger" "on a regular basis."  (Docket No. 152 Ex. A ¶ 6.)  However, other than these generalized allegations, the only incidents that Barrett specifically points to in support of her hostile work environment claims occurred outside the Title VII limitations period.  The most recent incident that Barrett complains of was Travis's use of the word "nigger," which, Barrett alleges, occurred several times before Travis left his employment in November 2003.[9] Moreover, Barrett testified during her deposition that she has not experienced any "issues regarding race" since she moved to her current job within the facility in approximately 2002 or 2003.  (Barrett Dep. at 65, 16-17.)  As all of the specific harassing incidents that she alleges fall well outside the three-hundred day limitations period that preceded her EEOC filing, and as she

_____

[9]Barrett also notes the appearance of racist graffiti on a cart used by a black co-worker in 2006.  As this incident took place well after she filed the EEOC charge, it does not retroactively render her claims timely.

herself acknowledged she has not observed further specific harassing incidents since moving to her current job, Barrett's Title VII hostile work environment claim is time-barred. She has, however, raised a question of fact as to the timeliness of her Section 1981 hostile work environment claim.

With respect to her Title VII retaliation claim, Barrett provides no dates—or even approximate dates—for either the allegedly unfavorable job assignments she received or the "shunning" she claims to have experienced at the hands of her white co-workers. However, Barrett's deposition testimony again sheds light on the issue. Not only did she testify that she has not experienced any issues relating to race since moving to her new position in 2002 or 2003, but she also testified that the unfavorable job assignments that she claims to have received were meted out by her supervisor in the Facility's Training Department, (Docket No. 152 Ex. A ¶¶ 18-21), where she worked from 1997 to 1999, (Barrett Dep. at 21-22). Thus, there is no basis to infer that the allegedly retaliatory job assignments occurred after October 15, 2004. As for the alleged "shunning," as Barrett could not point to any allegedly retaliatory shunning that has occurred since 2002 or 2003, let alone within the three-hundred-day period prior to her EEOC filing, that retaliation claim is likewise untimely.[10]

---

[10]Barrett alleges that her retaliation claims are timely under a continuing violations theory. She does not, however, allege any retaliatory acts that fell within the three-hundred-day period prior to her EEOC filing and that could render timely her claims of earlier retaliatory actions. Moreover, as she has not demonstrated that a longstanding and demonstrable policy of discrimination was a matter of standard operating procedure at the La Vergne Facility, *see Sharpe*, 319 F.3d at 268, she cannot rely on the continuing violations doctrine under any circumstances.

13

2.    Hostile work environment

The defendant argues that Barrett has failed to establish a *prima facie* case with respect to her hostile work environment claim.[11]

First, the defendant argues that Barrett's claim fails because she is not a member of a protected class. Although the defendant acknowledges that a plaintiff need not personally be a protected class member to assert a claim for racial discrimination, it argues that Barrett has not demonstrated either an association with, or advocacy on behalf, of a protected class member.

The defendant argues that, for a white plaintiff to bring a discrimination claim under an association theory, she must demonstrate a familial or intimate association with a protected class member. This overstates the import of the relevant caselaw, however. In *Tetro*, the Sixth Circuit noted that Title VII has been construed "to protect individuals who are the victims of discriminatory animus towards third persons with whom the individuals associate." 173 F.3d at 994. Although the court went on to hold that the plaintiff, a white man, could maintain a Title VII claim on the basis of his relationship with his bi-racial daughter, the court notably did not suggest that a plaintiff necessarily needs to be related by biology, marriage, or another intimate relationship to bring a Title VII claim based on association. *See id.* Applying this case subsequently, the Sixth Circuit declined to read in a requirement that association requires a familial or intimate relationship. *Johnson*, 215 F.3d at 574 (construing *Tetro*, 173 F.3d at 994, and stating, "[s]imply put, this court has now spoken that in order to state a cognizable claim under Title VII, the plaintiff himself need not be a member of a recognized protected class, he

_____

[11]Although Barrett's Title VII claims are untimely, her hostile work environment claim under Section 1981 remains and is evaluated under the standards applied to such claims under Title VII. *See* n.7 *supra.*

14

need only allege that he was discriminated on the basis of his association with a member of a recognized protected class.").  Ultimately, the import of *Tetro* is that a white Title VII plaintiff must demonstrate an association with a member of a protected class, but that relationship need not necessarily be familial or intimate.[12]

Although the fact that Barrett is not related to or intimately involved with a protected class member is not fatal to her claims, the question remains whether Barrett has raised a genuine issue of fact as to whether her relationships with her black co-workers at the La Vergne Facility constitute an association sufficient to entitle her to bring a hostile work environment claim.  Barrett argues that she befriended a handful of her black co-workers and describes several black co-workers as "friends."  (Docket No. 152 Ex. A ¶¶ 3, 5, 10, 12, 20.)  She provides no evidence, however, that those friendships constituted anything other than the casual, friendly relationships that commonly develop among co-workers but that tend to be limited to the workplace.  Barrett has not indicated that she socializes with any of her black co-workers outside of the workplace, that their families know each other, that they mutually provide the type of support and companionship that one would expect in a friendship that exists beyond the boundaries of one's workplace.  Essentially, Barrett has alleged that she is *friendly* with her co-

_____

[12]The defendant's reliance on *Bell v. Safety Grooving & Grinding, LP*, 107 Fed. Appx. 607 (6th Cir. 2004), is misplaced.  In that case, a white plaintiff brought a Title VII claim based on his association with his girlfriend, who had previously filed an EEOC charge against their mutual employer alleging gender-based discrimination.  The court held that the plaintiff could not bring a Title VII claim on the basis of this relationship.  However, that case addressed substantially different issues than did *Tetro*, a fact that the court acknowledged in *Bell*.  107 Fed. Appx. at 609.  In *Tetro,* the race of the child was essentially imputed to her father, which gave rise to his claim that he was discriminated against based on his race vis-à-vis hers.  173 F.3d at 994-95.  By contrast, the plaintiff in *Bell* did not assert that his girlfriend's gender was imputed to him, but rather that he simply was entitled to a Title VII claim because his girlfriend had a Title VII claim.  107 Fed. Appx. at 609.  Thus, *Bell* cannot be read, as the defendant claims, to limit *Tetro* solely to familial relationships.

15

workers. While the sincerity of Barrett's claim is not in doubt, such standard workplace familiarity and collegiality does not establish an association for the purposes of bringing a hostile work environment claim. If that were the case, any white co-worker who maintained a passing friendly relationship with a black co-worker would have grounds for such a claim, in which case the rule requiring a white plaintiff to demonstrate an association would serve little purpose.

The defendant argues not only that Barrett fails to demonstrate an association with a protected class member, but also that she fails to demonstrate advocacy on behalf of a protected class member. In *Johnson*, the Sixth Circuit indicated that a hostile work environment claim may lie when a plaintiff alleges discrimination as a result of his advocacy on behalf of individuals who are members of a protected class. 215 F.3d at 575. In that case, a high-ranking affirmative action official was permitted to bring a Title VII claim against his employer on the basis of his advocacy on behalf of women and minorities in relation to his employer's discriminatory hiring practices. *Id.* Here, Barrett does not allege that she assisted black co-workers in filing discrimination charges, or that she participated in such activities, or that she made any type of formal complaint as to the work environment at the La Vergne Facility. However, she does claim that she assisted black co-workers in preparing their resumes and recommending them for job openings and that she complained about the racist conduct she observed at the Facility.

Barrett's strongest allegations of advocacy are that she complained on several occasions about the racist environment at the Facility. However, the question of whether such actions qualify as advocacy under *Johnson* need not be decided here and has no bearing on the outcome of the defendant's motion, because the incidents that Barrett complains of do not constitute

16

severe and pervasive harassment under any circumstances. Although mindful of *Jackson v. Quanex*, in which the Sixth Circuit cautioned district courts against "minimiz[ing] proof of persistent racial slurs and graffiti," 191 F.3d at 662, the incidents about which Barrett complains were relatively sporadic and isolated and were not, by and large, directed at her, and thus do not permit the inference that they created an objectively hostile work environment. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000) ("[R]acial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at [the plaintiff], over a twenty-year span of time."); *Bryant v. Martinez*, 46 Fed. Appx. 293, 297 (6th Cir. 2002) (fact that offensive comments were not directed at plaintiff reduces the probative value of those comments). Although the incidents and language were without a doubt offensive and entirely inappropriate in a work environment, offensive and inappropriate comments do not necessarily give rise to a hostile work environment claim. *See Kelly v. Senior Ctrs., Inc.*, 169 Fed. Appx. 423, 429 (6th Cir. 2006) ("[C]onduct that is deplorable, off-color, or offensive to our most basic value of according respect and dignity to every person, is not always legally actionable as a "hostile environment.'"). As Barrett has not raised a genuine issue of fact as to the existence of an objectively hostile work environment, summary judgment is appropriate.

B.      *WT Melton*

Melton was employed by Whirlpool at the La Vergne Facility from approximately January 1995 until July 2007. She alleges that, on numerous occasions during the course of her employment, she heard white workers, managers, and supervisors use racial slurs and epithets and denigrate blacks as "lazy." Specifically, she alleges that she heard a white co-worker disparage Martin Luther King, Jr. Day and advocate for "James Earl Ray Day," (Docket No. 154 at 2-3), and that she heard white worker Dale Travis repeatedly use the word "nigger" to refer to

17

black workers, (Docket No. 154 at 3). Additionally, she alleges that she heard Travis tell a joke that referenced the Ku Klux Klan, but that a supervisor who overheard the joke did nothing to stop or prevent such behavior. (Docket No. 154 at 3.) Melton also alleges that she observed a white supervisor treat a black temporary employee in a degrading manner, when white employees were not treated in this manner. (Docket No. 154 at 3.)

In addition, Melton claims that, on at least two occasions, she observed white supervisors ignore injuries sustained by black workers rather than helping those workers obtain on-site medical treatment. (Docket No. 154 at 3.) Melton claims that, on those occasions, she assisted those injured workers by helping them obtain the treatment they needed. (Docket No. 154 at 3.) She further claims that, on one of those occasions, she complained to the injured worker's white supervisor, and the supervisor subsequently criticized Melton's work. (Docket No. 154 at 4.) On another occasion, a supervisor criticized her for leaving her position to help her injured co-worker. (Melton Dep. at 107-08.) During her deposition, Melton additionally testified that she had assisted a black co-worker in obtaining a leave of absence and helped another black co-worker obtain an air conditioner for her elderly mother through a program in place at Whirlpool. (Melton Dep. at 36.)

According to Melton, she was friends with a number of black co-workers. (Docket No. 154 at 6.) She claims that, because of these friendships and because she defended black co-workers whom she felt were being mistreated, refused to participate in racist conduct, and complained about such conduct,[13] her white co-workers "ostracized" her and gave her "funny

_____

[13]Melton asserts that, though she was a member of the union, the union was ineffective in addressing problems at the La Vergne Facility. (Docket No. 154 at 5.)

18

looks." (Docket No. 154 at 4.) She also alleges that white workers who associated with black workers were referred to as "nigger lovers." (Docket No. 154 at 4.)

Additionally, Melton claims that she received unfavorable job assignments and a demotion in retaliation for her associations and actions, ultimately resulting in her constructive termination. (Docket No. 154 at 6.) Specifically, Melton complains that, when she returned to work after undergoing surgery in April 2005, she was reassigned to a lower-paying and more physically demanding position, while other employees in similar situations were generally assigned to office work. (Docket No. 154 at 6.) Melton further alleges that, after returning to work after a second surgery in September 2005, she was first assigned to a physically demanding position and then laid off a week later. (Docket No. 154 at 6.) Finally, Melton alleges that, when she returned from a third surgery in September 2006, she was again laid off because Whirlpool ostensibly could not accommodate her physical restrictions, though Melton claims that there were in fact jobs available that she could have performed. (Docket No. 154 at 6.) Melton subsequently returned to work but then retired in July 2007. (Melton Dep. at 24; Docket No. 154 at 4.) According to Melton, Whirlpool's Human Resources department "pulled strings" to ensure that Melton received unfavorable assignments following her surgery. (Docket No. 154 at 5.)

1.     Hostile work environment[14]

The defendant argues that Melton has failed to establish a *prima facie* case with respect to her hostile work environment claims.

_____

[14]The defendant did not challenge the timeliness of Melton's claims.

19

First, the defendant argues that Melton's claims fail because she has not demonstrated an association with a protected class member. Melton claims that she "openly associated with Black co-workers." (Docket No. 154 Ex. A ¶ 5). When testifying about those relationships during her deposition, she stated that she occasionally ate lunch at the Facility with a black co-worker, (Melton Dep. at 103-04), conversed with a black co-worker in the hallway, (Melton Dep. at 105-06), and had a friendly relationship with another black co-worker, whom she would occasionally hug in greeting, (Melton Dep. 106). As with Barrett, one cannot reasonably infer that these relationships rose beyond the level of everyday workplace collegiality. Though it may well be that Melton maintained a friendlier relationship with her black co-workers than did some of her white co-workers at the Facility, such conclusory allegations of association are insufficient to enable Melton to bring a hostile work environment claim under an association theory.

The defendant also argues that Melton has not demonstrated that she engaged in advocacy on behalf of a protected class member. Melton alleges that she advocated on behalf of black co-workers in that she objected to racist remarks or treatment that she observed at the La Vergne Facility, assisted injured black co-workers on two occasions,[15] helped a black co-worker

_____

[15]Melton argues strenuously that accompanying her injured black co-workers to the on-site medical facility was commensurate with "[fighting] for her minority co-workers to receive an employment benefit—i.e., onsite medical care—on an equal basis with their White co-workers." (Docket No. 154 at 16.) This overstates not only Melton's actions, but also the severity of the incidents. For example, on one occasion, a supervisor expressed frustration about a black co-worker leaving "the line"; Melton informed the supervisor that her co-worker, whose eye was reddened, needed medical assistance, and Melton assisted the co-worker in locating the medical office. (Melton Dep. at 29-30.) There is no indication that the injured worker was denied necessary medical care, as Melton intimates. Moreover, there is nothing—beyond Melton's speculation—to suggest that the manager's actions were related to race, and Melton herself testified that she was uncertain whether they were related to race. (Melton Dep. at 33.)

obtain a leave of absence, and helped a black co-worker obtain an air conditioner for her elderly mother through a program in place at Whirlpool.

As with Barrett's claim, however, the question of whether these actions constitute advocacy need not be resolved, as Melton's claims suffer the same fatal flaw as did Barrett's, in that her allegations do not create a genuine issue of fact as to whether she suffered severe and pervasive harassment. Melton's allegations that she received "funny looks" from her white co-workers are vague and can hardly be said to contribute to objectively severe and pervasive harassment, and the smattering of slurs and jokes that she overheard were relatively infrequent and were not directed at Melton herself. Although such conduct is offensive, it simply does not constitute harassment objectively severe and pervasive enough to establish a hostile work environment claim.

### 2. Retaliation

Melton asserts that the job postings that she received after her surgeries in 2005 and 2006, which ultimately culminated in her constructive discharge in July 2007, and the manner in which she was treated by her co-workers, supervisors, and managers all constitute retaliation in violation of Title VII.

The defendant claims that Melton has failed to establish a *prima facie* case of retaliation. First, the defendant argues that Melton did not engage in any activities that constitute "opposition" to its allegedly discriminatory practices. Under Title VII, however, a plaintiff need not make a formal complaint to establish opposition.[16] *See Johnson*, 215 F.3d at 579-80. To the

---

[16]Title VII provides that a retaliation claim may be based *either* on a plaintiff's opposition to an employer's discriminatory practice *or* a plaintiff's participation in a formal proceeding challenging a discriminatory practice, such as the act of filing an EEOC charge. 42 U.S.C. § 2000e-3(a). Thus, a plaintiff need not have made a formal complaint to bring a retaliation claim

extent that Melton complained to supervisors or managers at Whirlpool about the racist comments that she overheard, she may well have engaged in opposing activity.

However, the question of whether Melton engaged in opposing activity, again, is not determinative because Melton has provided nothing beyond her own unsupported assertions that any of the alleged retaliatory incidents were causally related to any opposing activity. There is no evidence that the job postings or layoffs were the result of Melton's opposition, and nothing to corroborate Melton's assertions that others in similar situations were treated differently, that the postings she received were inconsistent with her physical restrictions, or indeed that Whirlpool's actions reflected anything but its changing staffing needs. Moreover, Melton acknowledges that, on at least one occasion when she complained about the job assignment she received after returning from surgery, she in fact was given a lighter-duty assignment, further undermining her claim that the initial assignment was retaliatory. (Docket No. 154 Ex. A ¶ 10; Melton Dep. at 25-26.)

Finally, to the extent that Melton alleges that the harassing treatment she allegedly experienced constituted retaliation, based on the facts that white workers who associated with black workers were sometimes called "nigger lover" and that Melton felt ostracized, that claim fails as well.[17] Although the slur "nigger lover" is undeniably offensive, Melton testified during her deposition that she herself had not heard anyone use the term, but that she had heard of this second-hand. (Melton Dep. at 94.) Moreover, the ostracism that Melton claims to have

under the opposition clause, as such a requirement would render that clause meaningless.

[17]To the extent that such incidents were perpetrated by Melton's co-workers, the Sixth Circuit has not recognized claims of co-worker retaliatory harassment, *Little v. BP Exploration & Oil Co.*, 129 Fed. Appx. 260, 262 (6th Cir. 2005), and thus only those retaliatory harassment claims based on the conduct of a supervisor or manager are actionable under Title VII, *see Morris*, 201 F.3d at 791; *Swanson v. Livingston County*, 121 Fed. Appx. 80, 85 (6th Cir. 2005).

22

experienced took place over the period of a number of years, and her allegations of ostracism are generalized and not terribly severe. *See Mast v. Imco Recycling of Ohio, Inc.*, 58 Fed. Appx. 116, 124 (6th Cir. 2003) (holding that plaintiff did not state claim for retaliation where, *inter alia*, she made "general allegations of being shunned by her co-workers and supervisors"). Given the totality of the circumstances, these allegations do not give rise to a genuine issue of material fact as to whether Melton was subject to retaliatory harassment.

C.    *Treva Nickens*

Nickens was employed by Whirlpool at the La Vergne Facility from approximately May 1983 until July 2007. She alleges that, on numerous occasions during the course of her employment, she heard white workers use racial slurs and epithets. Specifically, she alleges that, from 2002 through 2005, she heard one white worker use the term "nigger" on a weekly basis and heard another white worker use the term "nigger" approximately twice a week and tell racial jokes on at least two occasions. (Docket No. 153 at 2; Nickens Dep. at 24-26.) From 2004 through mid-2005, Nickens alleges that she heard a third white worker make racist comments weekly. (Docket No. 153 at 2.) Additionally, from 2001 until approximately 2005, Nickens heard white worker Dale Travis use the word "nigger" on a daily basis, and she alleges that a supervisor to whom she complained about such comments did nothing to stop or prevent such behavior. (Docket No. 153 at 2-3, 6.) Nickens also asserts that, though she told Travis to "watch his language," Travis had an extensive criminal record and she was fearful that he would retaliate against her as a result.[18] (Docket No. 153 at 4.) According to Nickens, she also

_____

[18]Nickens also complains that, after Travis was fired, he made a comment about an assault and battery charge carrying only a $150 fine, and she perceived this comment to be a threat to her because she believes that Travis blamed her for his firing. (Docket No. 153 at 5.) Nickens further claims that she complained about this threat to a supervisor but that nothing was

23

observed a white supervisor give Henry Beasley, a black worker, extra job assignments, follow him in a cart, forbid him from fraternizing with Nickens, and prevent him from advancing to better positions. (Docket No. 153 at 3.) Although Nickens claims that she complained about the racist conduct she observed, she asserts that her complaints fell on deaf ears, and a supervisor to whom she complained used the term "nigger" himself and told her she just needed to "get used to this." (Docket No. 153 at 4.)

According to Nickens, she was friends with a number of black co-workers. (Docket No. 154 at 6.) Nickens claims, because of these friendships, and because she refused to participate in racist conduct and complained about such conduct,[19] her white co-workers "ostracized" her and "outcasted" [*sic*] her. (Docket No. 153 at 3.) She also alleges that white workers who associated with black workers were referred to as "nigger lovers." (Docket No. 153 at 3-4.) Additionally, Nickens complains that, from 2004 through 2005, two white workers informed her weekly that she should "stay with [her] own kind" and that Beasley "needs to do the same." (Docket No. 153 at 4.) Nickens also asserts that, in 2005, a white supervisor harassed her for associating with black workers, although she does not specify the nature of this alleged harassment. (Docket No. 153 at 4.) Also in 2005, Nickens alleges that a supervisor refused to permit Nickens to hold a

_____

done to redress the situation. (Docket No. 153 at 6, 8.) The defendant strongly contests Nickens's interpretation of Travis's comment as a threat. (Docket No. 173 at 14.) Regardless, as Travis was no longer employed at Whirlpool at the time the statement was made, it has no bearing on Nickens's claims here.

[19]Nickens asserts that, though she was a member of the union, the union was ineffective in addressing problems at the La Vergne Facility. (Docket No. 153 at 6.) According to Nickens, the union president frequently used the word "nigger," and, when she complained to him about the racist language, he laughed at her complaints and did nothing to address them. (Docket No. 153 at 6-7; Nickens Dep. at 27-28.)

birthday celebration for Beasley but that nothing was done to redress the situation after Nickens complained to the Human Resources department. (Docket No. 153 at 7.)

Nickens additionally alleges that she received unfavorable job assignments as a result of her associations and actions. (Docket No. 153 at 8.) Specifically, Nickens complains that, in 2005, she bid for a posted position, and a supervisor subsequently removed the posting and told Nickens that she would "never get the job." (Docket No. 153 at 8.) The job was reposted only after Nickens had switched departments, which rendered her ineligible for the posted job. (Docket No. 153 at 8-9.) Nickens also claims that, in mid-2005, she was bypassed for overtime in favor of six employees with less seniority. (Docket No. 153 at 9.) Finally, Nickens asserts that she was not permitted to work from November 2006 through January 2007, even though there were positions available for which she was qualified, and that she was effectively terminated at that time. (Docket No. 153 at 9.)

     1.     Statutes of limitations

The defendant asserts that Nickens's claims are untimely. Nickens filed a charge with the EEOC on August 5, 2005 and filed the complaint in this action on January 10, 2006. Thus, her Title VII hostile work environment claim is timely if any of the incidents that contribute to the allegedly hostile work environment occurred within three hundred days prior to the EEOC filing, or after October 9, 2004, and her Section 1981 hostile work environment claim is timely if any of the contributing incidents occurred within four years prior to her filing the complaint, or after January 10, 2002. Additionally, her Title VII retaliation claim is timely if the allegedly retaliatory action occurred after October 9, 2004.

Nickens claims to have heard a number of racist comments in 2004 and 2005. As those comments are part of a single alleged hostile work environment and occurred within the

25

limitation periods governing both Title VII and Section 1981, those claims are timely, even to the extent that they encompass events that occurred outside the limitations period. Additionally, with regard to her retaliation claims, the alleged retaliation that Nickens experienced—admonishments that she "stay with her own kind," the reposting of a job she had applied for, and the denial of her application for overtime—occurred in 2005, and thus also are timely.[20]

2.    Hostile work environment

The defendant asserts that Nickens has failed to establish a *prima facie* case with respect to her hostile work environment claims.

The defendant first argues that Nickens's claims fail because she has not demonstrated an association with a protected class member. Nickens relies on her workplace friendships with black co-workers, particularly Beasley, to demonstrate association. (Docket No. 153 Ex. A ¶ 8.) However, as with Barrett and Melton, there is scant evidence that these friendships constituted anything beyond common workplace collegiality. Indeed, Nickens acknowledged in her deposition that she does not socialize with Beasley outside of work. (Nickens Dep. at 85.) Such a tenuous association is insufficient to establish that Nickens is protected by Title VII under an association theory.

The defendant also argues that Nickens has not established that she engaged in advocacy on behalf of a protected class member. The only advocacy that Nickens alleges she engaged in

---

[20]In addition to her more recent allegations, Nickens asserts that in 1988, a white co-worker threatened her for "hanging around niggers." (Docket No. 153 at 4.) According to Nickens, she complained about this threat to Human Resources, but that, as a result, she was informed that she shouldn't be "hanging around niggers" and was fired and unable to return to her job for six months. (Docket No. 153 at 7.) To the extent that Nickens asserts that this constitutes retaliation, such a claim is time-barred.

26

consists of the complaints she made about racist conduct that she observed at the Facility. Such allegations make, at best, a very weak case of advocacy.

Again, however, there is no need to resolve the question of advocacy, as Nickens has not established that she experienced severe and pervasive harassment under any circumstances. As with Barrett and Melton, the bulk of Nickens's allegations of harassing activity were not directed at Nickens herself. Although the slurs and racist comments of which she complains were indisputably offensive, they were not severe and pervasive enough that they can be said to have altered the conditions of her employment, *Harris*, 510 U.S. at 21, and thus do not give rise to a hostile work environment claim.

### 3. Retaliation

Nickens asserts that she was subject to retaliation in that a job posting for which she had applied was removed and only re-posted after she had accepted a different job assignment,[21] she was denied an overtime assignment, she was not permitted to return to work after suffering an injury even though there were available positions that she was capable of performing, and she was subject to retaliatory harassment.

The defendant claims that Nickens has not established a *prima facie* case of retaliation under Title VII. First, the defendant argues that Nickens, like Melton, cannot establish a retaliation claim as she did not engage in any opposing activity. However, the fact that Nickens did not engage in a more formal complaint process does not prevent her from establishing

---

[21]Nickens also asserts that, on another occasion, a job posting was removed "because management did not like [Nickens's] associations with Black co-workers," although Nickens acknowledges that she ultimately obtained that job through the union. (Docket No. 153 at 9.)

27

opposition and, like Melton, it is possible that the complaints that Nickens made are sufficient to constitute opposing activity.

However, even if Nickens did establish that she had engaged in opposing activity, her claim would still fail because there is no evidence other Nickens's own conclusory allegations of a causal connection between any of the alleged retaliatory incidents and Nickens's actions. During her deposition, Nickens testified about a variety of incidents involving vacation time, overtime, unemployment compensation, work assignments, dress code, and her supervisor's refusal to allow her to hold an on-site birthday party for Beasley, all of which Nickens perceived as retaliatory. (Nickens Dep. at 123, 133-48.) There is no indication, however, of any causal connection between any of these incidents and either Nickens's friendships with her black co-workers, or Nickens's complaints about the environment at the Facility, beyond Nickens's indeterminate "feeling" that the incidents were connected, and nothing to suggest that Nickens's perceptions had any basis in reality. Without more, such incidents do not reasonably give rise to a question of fact as to whether they constitute retaliation in violation of Title VII.

Finally, to the extent that Nickens asserts a claim of retaliatory harassment based on the fact that white workers who associated with black workers were called "nigger lover" and that Nickens claims to have been ostracized by her white co-workers, such a claim fails because none of that alleged harassment came at the hands of Nickens's supervisors or managers. *See Swanson*, 121 Fed. Appx. at 85. Moreover, even if a claim for co-worker retaliatory harassment existed, such a claim would still fail, given the totality of the circumstances, as Nickens's generalized allegations of slurs that were not directed at her specifically and unspecified ostracism are not severe and pervasive enough to give rise to a retaliatory harassment claim.

III.    **Uncontested Motions for Summary Judgment**

In addition to the motions filed with respect to the claims asserted by Barrett, Melton, and Nickens, the defendant has moved for summary judgment with respect to the claims asserted by plaintiffs Julien and Schuster, neither of whom opposed those motions. The court may not, however, grant the defendant's motions solely on the grounds that the plaintiffs failed to oppose those motions. *See Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his initial] burden. . . . The federal rules require that the party filing a motion for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact.

*Id.* (citing *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). The court, therefore, will consider whether the defendant has met its burden under the summary judgment standard.

A.    *Eugene Julien*

Julien was employed by Whirlpool at the La Vergne Facility from approximately 1998 through the present. He alleges that he has witnessed white co-workers making racist jokes and using racial slurs and epithets. (Docket No. 149 ¶¶ 50.) Specifically, Julien alleges that he observed white worker Dale Travis refer to blacks in a derogatory manner, comment that white employees should observe "James Earl Ray Day," and use the term "nigger" regularly. (Docket No. 149 ¶ 51.) Julien also alleges that he observed a white supervisor make derogatory jokes and use racial slurs in reference to black employees and employees of Middle Eastern descent. (Docket No. 149 ¶ 52.) He also alleges that he "spent more time than most of his white co-workers" socializing with black co-workers and that he assisted black workers preparing for interviews. (Docket No. 149 ¶ 53.) Julien claims that he did not complain about the racist

29

conduct he observed, but that his white co-workers made derogatory comments to him and excluded him from social events, which he believes was the result of his association with his black co-workers.  (Docket No. 149 ¶¶ 55.)  Julien also alleges that, in 2003 or 2004, pieces of metal were forced into the ignition of his tow motor and the ignitions of the tow motors of his black co-workers.  (Docket No. 149 ¶ 55.)

        1.      Statutes of limitations

The defendant asserts that Julien's claims are untimely.  (Docket No. 112 at 7-10.)  Julien filed a charge with the EEOC on July 27, 2005 and filed the complaint in this action on January 10, 2006.  Thus, his Title VII hostile work environment claim is timely if any of the incidents that contribute to the allegedly hostile work environment occurred within three hundred days prior to the EEOC filing, or after September 30, 2004, and his Section 1981 hostile work environment claim is timely if any of the contributing incidents occurred within four years prior to his filing the complaint, or after January 10, 2002.  Additionally, his Title VII retaliation claim is timely if the allegedly retaliatory action occurred after September 30, 2004.

In the complaint, Julien does not provide any time frame for the incidents that form the basis of his hostile work environment claims.  In its brief, however, the defendant indicates that at least some of these incidents occurred between 2001 and 2003.  (Docket No. 112 at 13.)  Additionally, Julien alleges that his tow motor was vandalized in 2003 or 2004.  Although tenuous, these assertions create, at the very least, a question of fact as to whether Julien's claims are timely.

        2.      Hostile work environment

The defendant asserts that Julien's hostile work environment claims fail because Julien is not a member of a protected class and has failed to demonstrate that he suffered discrimination as a result of his association with or advocacy on behalf of protected class members.

Julien asserts that he spent "more time than most white co-workers" with black co-workers. As with the other plaintiffs, however, these friendships, which appear to be limited to the workplace, do not establish an association sufficient to enable Julien to maintain a discrimination claim. Additionally, unlike the other plaintiffs, Julien has not alleged that he so much as complained about the racist conduct he observed, and, to the extent that he provided some limited assistance to his black co-workers by, for example, helping them prepare for job interviews, such actions do not constitute advocacy. The defendant thus has demonstrated that there is no genuine factual dispute as to whether Julien is protected by means of either his association with or his advocacy on behalf of protected class members.

3.      Retaliation

The defendant claims that Julien has failed to establish a *prima facie* case with respect to his retaliation claim, which is based primarily on the vandalism of his tow motor in 2003 or 2004. Julien additionally asserted during his deposition that he also was retaliated against in that he was assigned to jobs that he could not physically perform. (Docket No. 112 at 16-17.)

There is no basis in the record for inferring that Julien was engaged in any opposing activity sufficient to establish a retaliation claim. Moreover, there is no evidence of any causal connection between Julien's fraternization with his black co-workers and the job assignments he received, as Julien himself acknowledged during his deposition. (Docket No. 112 at 17.) Additionally, even drawing all inferences in favor of Julien, the tow motor incident alone does

31

not permit the inference that Julien was subject to retaliatory harassment, as there is no evidence of a connection between Julien's fraternization with black co-workers and the vandalism.

### B.     Larry Schuster

Schuster was employed by Whirlpool at the La Vergne Facility from approximately December 1993 through May 2004.  He alleges that he "regularly witnessed" white co-workers making racist jokes and using racial slurs and epithets and that he "frequently saw" racist graffiti in the Facility.  (Docket No. 149 ¶¶ 98-100.)  He also alleges that he "spent more time than most of his white co-workers" socializing with black co-workers and that he showed black co-workers how to bid on available jobs and assisted in training black co-workers who needed assistance. (Docket No. 149 ¶¶ 101-02.)  Schuster claims that he did not complain about the racist conduct he observed, but that his white co-workers made derogatory comments to him and excluded him from social events, which he believes was the result of his association with black co-workers. (Docket No. 149 ¶¶ 103-04.)  Schuster provides no time frame for these allegations, nor any other specific details about the factual predicates for his allegations.

#### 1.     Statutes of limitations

The defendant asserts that Schuster's claims are untimely.  Schuster filed a charge with the EEOC on July 27, 2005 and filed the complaint in this action on January 10, 2006.  Thus, his Title VII hostile work environment claim is timely if any of the incidents that contribute to the allegedly hostile work environment occurred within three hundred days prior to the EEOC filing, or after September 30, 2004, and his Section 1981 hostile work environment claim is timely if any of the contributing incidents occurred within four years prior to his filing the complaint, or after January 10, 2002.  Additionally, his Title VII retaliation claim is timely if the allegedly retaliatory action occurred after September 30, 2004.

32

Schuster's employment at Whirlpool was terminated as of May 21, 2004. As such, none of the allegedly harassing or retaliatory incidents could have taken place within the three-hundred-day period that preceded his EEOC filing. Thus, Schuster's Title VII claims are time-barred.

With respect to Schuster's Section 1981 claims, the defendant asserts that there is no basis to conclude that any of the incidents contributing to a hostile work environment occurred within the limitations period. The defendant's own brief, however, indicates otherwise, noting that Schuster testified to hearing racial slurs used at the Facility in 2003. (Docket No. 106 at 7.) Thus, there is, at the least, an issue of fact as to whether Schuster's Section 1981 hostile work environment claim is timely.

2. Hostile work environment

The defendant argues that Schuster's hostile work environment claim fails because Schuster is not a member of a protected class and has failed to demonstrate that he suffered discrimination as a result of his association with or advocacy on behalf of protected class members.

The extent of Schuster's allegations of association is that he spent "more time than most white co-workers" with black co-workers. There is no indication these workplace friendships were any more significant than the friendships alleged by Schuster's co-plaintiffs, which were likewise insufficient to establish a discrimination claim based on association. Moreover, Schuster acknowledges that he never complained about the environment at the Facility, (Docket No. 149 ¶ 102), and the extent of the "advocacy" in which Schuster alleges to have engaged consists entirely of an ambiguous complaint to a supervisor that his co-workers might need to discuss "something" with the supervisor, (Docket No. 106 at 7), and some on-the-job training

33

assistance that he provided to black co-workers. The defendant thus has demonstrated that there is no genuine factual dispute as to whether Schuster is protected by means of either his association with, or his advocacy on behalf of, protected class members.

## **CONCLUSION**

For the reasons discussed herein, the motions for summary judgment as to the claims asserted by the plaintiffs Lynette Barrett, WT Melton, Treva Nickens, Eugene Julien, and Larry Schuster will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

Case 3:06-cv-00017   Document 177   Filed 02/12/08   Page 34 of 34 PageID #: 3963