UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 08-5307

**FILED**
Feb 23, 2009
LEONARD GREEN, Clerk

**RECEIVED**
IN CLERK'S OFFICE

FEB 2 5 2009

**U.S. DISTRICT COURT
MID. DIST. TENN.**

LYNETTE BARRETT; W. T. MELTON; TREVA NICKENS,
    Plaintiffs - Appellants,
EUGENE JULIEN; LARRY SCHUSTER; DIANA SIMMONS,
    Plaintiffs,

v.

WHIRLPOOL CORPORATION,
    Defendant - Appellee.

Before:   COLE and COOK, Circuit Judges; EDMUNDS, District Judge.

## JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's decision is AFFIRMED in all respects, except as to Plaintiff Treva Nickens's hostile work environment claim. As to that claim, IT IS ORDERED that this court REVERSES and the case is REMANDED for trial.

**ENTERED BY ORDER OF THE COURT**

Leonard Green
Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

**FOR YOUR INFORMATION**

LYNETTE BARRETT; W. T. MELTON; TREVA
NICKENS,

                *Plaintiffs-Appellants,*

EUGENE JULIEN; LARRY SCHUSTER; DIANA
SIMMONS,

                      *Plaintiffs,*

     *v.*

WHIRLPOOL CORPORATION,

                *Defendant-Appellee.*

No. 08-5307

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00017—Aleta Arthur Trauger, District Judge.

Argued: December 3, 2008

Decided and Filed: February 23, 2009

Before: COLE and COOK, Circuit Judges; EDMUNDS, District Judge.[*]

---

### COUNSEL

**ARGUED:** David W. Sanford, SANFORD, WITTELS & HEISLER, Washington, D.C.,
for Appellants. Adam C. Wit, LITTLER MENDELSON, Chicago, Illinois, for Appellee.
Elizabeth Ellen Theran, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** David W.
Sanford, SANFORD, WITTELS & HEISLER, Washington, D.C., Kevin H. Sharp,
DRESCHER & SHARP, Nashville, Tennessee, for Appellants. Adam C. Wit, Keith C.
Hult, LITTLER MENDELSON, Chicago, Illinois, Jeffrey S. Hiller, LITTLER
MENDELSON, Columbus, Ohio, for Appellee. Elizabeth Ellen Theran, UNITED
STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington,
D.C., for Amicus Curiae.

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of
Michigan, sitting by designation.

## OPINION

COLE, Circuit Judge.  Lynette Barrett, W. T. Melton, and Treva Nickens (collectively, "Plaintiffs"), employees or former employees of Whirlpool Corporation ("Whirlpool"), appeal a grant of summary judgment in favor of Whirlpool in this race-discrimination and retaliation case. Plaintiffs allege that they were discriminated against on the basis of their friendships with and advocacy for certain African-American co-workers in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981"). The district court found that Plaintiffs failed to establish the requisite degree of association with their African-American co-workers to support their claim of discrimination based on such association and that, in any case, Plaintiffs were not subjected to a hostile work environment or retaliation. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment against Plaintiffs Barrett and Melton and against Nickens on her retaliation claim, **REVERSE** the district court's grant of summary judgment against Nickens on her hostile work environment claim, and **REMAND** for trial on that claim.

## I. BACKGROUND

Whirlpool's LaVergne, Tennessee Division manufactures built-in refrigerators, air conditioners, dehumidifiers, and related products. At any given time, it employs up to 2100 employees, approximately twenty percent of whom are African-American.

### A.    Plaintiff Lynette Barrett

Barrett, who is Caucasian, has been employed by Whirlpool since 1984 and is currently a technician in the built-in refrigerator department. She has worked in a number of different positions and departments within Whirlpool.

Barrett alleges that in approximately 2001 she heard Dale Travis, a co-worker with an alleged history of racially harassing behavior, make three (or possibly four) racist

comments. On one occasion, while Barrett was conversing with an African-American friend, Helen Lust, Travis said about Lust, within hearing distance of supervisor Bill Westberry, "the nigger bitch will get what's coming to her." (Joint Appendix ("JA") 824-25.) When Barrett told Travis she did not approve of his language, he called her a "bitch" and told her to "mind [her] own business." (JA 825-26.) Barrett complained to Westberry, who told her to "leave it alone." (JA 828.) On a second occasion, after Barrett had helped an African-American co-worker, Lisa Majors, obtain a promotion, Travis said to Barrett and Majors's sister, "[w]ell, she'll be an uppity nigger now." (JA 830.) Barrett reported this comment to Beverly Gordon, her supervisor, who said she "would take care of it," but Barrett does not know if Gordon took any action. (JA 832.) On a third occasion, while in Westberry's office, Barrett overhead Travis tell a racist joke, and Westberry "snickered" at the joke. On another occasion (which may or may not have involved racist comments), Barrett told Travis she did not like his language, and he responded that he had a nine-millimeter gun. As a result, Barrett feared that Travis might harm her for reporting his other racist remarks, though she did not mention the nine-millimeter comment to a supervisor. Travis was terminated in 2003 for excessive absenteeism.

Other than these several incidents involving Travis, Barrett testified that she never heard any racial slurs used at Whirlpool, although Barrett also was present in a group of employees when, around the time of Martin Luther King, Jr. Day, a white employee named Robert Stanford suggested that there should be a "James Earl Ray Day." Barrett believes she informed her then-supervisor, Mark McCool, of this comment and that McCool said he would take care of it. Barrett does not know what action he took, if any, but she never heard Stanford make another racist comment.

Barrett saw two instances of racist graffiti in the restroom at Whirlpool—a large triangle composed of the word "nigger," and the letters "KKK." Another employee reported the graffiti, and it was painted over within a couple of days. Barrett also saw and reported racist graffiti consisting of the letters "KKK" and a picture of a noose on a maintenance cart used by an African-American employee. Barrett reported the graffiti

to her supervisor, Buck Bingham, who is African-American. Whirlpool made a report of the event and repainted the cart.

Barrett alleges that a manager in the Human Resources Training Department, Wendy Beam, acted coldly toward Majors, refusing to make eye contact with or sit next to her. According to Barrett, Beam disapproved of Barrett's friendship with Majors and, as a consequence, directed desirable work away from Barrett. Barrett complained to another supervisor about Beam's coldness toward Majors, although Barrett apparently never complained about the alleged redirection of work. Majors did not share Barrett's perceptions about Beam, stating that she never felt "shunned" by Beam and often spoke with and sat next to Beam in meetings.

Barrett was friendly toward black employees on the assembly line, and she alleges that, as a result, four white employees "gave [her] the cold shoulder," "snubbed" her, and would not talk to her. (JA 840-43.) One white employee, a non-supervisory "group leader" named Mark Watwood, allegedly would "snirl his nose and turn and walk off" when Barrett said "hello" to the black employees in the area. (JA 841.) He would also pretend not to hear Barrett's work-related requests for materials. According to Barrett, Watwood and three other white employees on the line would turn their backs on her when she spoke to a black employee but would smile at her when she was speaking to a white employee. This negative reaction came from only a few white employees, and no one explicitly said anything to Barrett about her friendliness toward black employees. Barrett agreed that the "vast majority" of white employees "had no problem" with her relationships with black employees. (JA 842.)

## B.     Plaintiff W. T. Melton

Melton, a Caucasian employee, began working at Whirlpool in 1995. She had two surgeries in 2005 that interfered with her ability to work, and her doctor restricted her from doing various types of work. Whirlpool eventually placed her on physical layoff, and her employment ended in late 2006 or early 2007.

Melton alleges that she heard Travis call African-American employees "niggers," and according to a response to an interrogatory, Travis said to her "[m]ay the Klan be with you" approximately once a week from 1995 to 2003. (JA 991.) However, in her later deposition, Melton did not assert that Travis uttered this phrase directly to her, much less that he had said it to her regularly over an eight-year period. On one occasion when Travis used this phrase, Melton complained to a supervisor, Steven Knight. In approximately 2003, Travis said to Melton and another employee, "[m]issed you ladies at the Klan meeting last night." (JA 652.) Melton was told by a black co-worker that a supervisor named Charlie Fisher used the term "nigger lover," though Melton never heard a supervisor use this term. She also was told that a group leader who treated her badly had used the term "nigger lover." Melton alleges that "lots of people" used the term "nigger lover," although she did not name any other specific people or state that she had heard the term firsthand. (JA 970.) Melton said she did not complain about the use of this term because "it was common knowledge that it did no good and I needed my job." (JA 650.) She said that harassment was "pervasive all over the plant." (JA 650.) She overheard a manager, a union representative, and several other employees use the word "nigger," with one employee using it on a daily basis. She heard Caucasian employees joke about having a "watermelon day" and a "James Earl Ray Day." In about 2005, a Caucasian employee asked Melton how she could "stand the smell" of an African-American woman with whom Melton regularly ate lunch. (JA 653-54.)

Melton claims that after she returned from her surgeries, she was treated worse than other employees who had returned from medical leave. She was not allowed to return to the office job she had had before the surgeries but, rather, was placed in a physically demanding, lower-paying job. She believes that Fred Contreras, an employee in the Human Resources department, was responsible for this decision, and she thinks he based his decision on the fact that she "was always defending someone it seemed." (JA 939-41.) Melton states that the people she defended were usually of a different race or did not speak English well. She testified, without elaboration, "[t]he ones that defended the black people . . . didn't get by with anything . . . [t]hey had to stay on their

toes." (JA 972.) Melton claims she suffered "harassment" for being friendly with black co-workers: in 2005 and 2006, white employees would "walk around" her in the hallway or give her strange looks because she was being friendly to African-American co-workers. On several occasions, Melton helped black employees go to the medical office when she perceived that they needed medical attention; on two of these occasions, the employees' supervisors expressed anger with Melton as a result of her actions.

## C.    Treva Nickens

Nickens, a Caucasian woman, has been employed at Whirlpool since 1983. She has primarily worked within the trucking department in a position that involves packaging materials in cardboard. Nickens has been on medical leave since October 2005.

Nickens testified that, in 2004 and 2005, union official Billy White would "sit and listen to racial slurs from other employees." (JA 701.) In the same time period, another employee, Robert Quiggle, who was often with White, told Nickens two racist jokes and generally used racist slurs including the word "nigger." Nickens did not complain to a manager. From approximately 2002 to 2005, Nickens heard an employee named Lulu Roper use the word "nigger" about once a week, but Nickens did not complain to a supervisor. Nickens heard that Quiggle and Roper were later terminated for making racist comments.

Around 2001 or 2002, Nickens would occasionally fill in for absent employees who worked in the same area as Travis, and every day that she worked there, she heard Travis use the word "nigger." Nickens complained to Travis's supervisor, Westberry, but he would just laugh at her. Nickens alleges that, following his termination, Travis caused two of his friends at Whirlpool, Rob Spivey, Nickens's group leader, and Barry Hibdon, her co-worker, to relay a comment to Nickens implying that Travis would physically assault her for reporting his racially offensive language. As a result, Nickens feared that Travis would harm her as she exited the plant. She relayed her concerns to her supervisor, Bingham, and to the union's grievance coordinator, who then

accompanied her to the Human Resources department to report the incident. Although Human Resources assured Nickens that it would address the incident, she is not aware of any action being taken.

Nickens testified that Spivey, who is African-American, and Hibdon would harass her for "hang[ing] around with blacks," particularly for spending time with her friend and co-worker Henry Beasley. (JA 717.) Nickens alleges that Spivey made a comment that "he didn't think it was right[,] Henry hanging around with white women." (JA 885.) She stated that a white supervisor, Knight, would tell her that she "need[ed] to stay with [her] own kind and [Beasley] need[ed] to stay with his own kind." (JA 718.) Nickens alleges that a co-worker, Margaret Goins, told Nickens that she did not "date niggers" and was "not a nigger lover." (JA 718.) Goins and another co-worker, Linda Cregger, told Nickens on approximately a weekly basis that she "needed to stay with her own kind and Henry needs to do the same." (JA 720-21.) Nickens complained to Knight "on a daily - - weekly, daily basis" about these comments, but Knight refused to do anything, explaining that he was a "mean person." (JA 720.) Eventually, to avoid the comments, Nickens stopped going to the area where Goins and Cregger worked. Nickens also stated that she felt that Bingham harassed her because of her relationships with black employees. Bingham claimed that Nickens never reported to him, or, to his knowledge, anyone else, that she had heard any racist comments or experienced any race-related discrimination.

Nickens alleges that when she applied for a higher-paying "Quality Tech" position that was posted in early 2005, Knight, Beasley's supervisor, told her that she "would never get the job" and that he would take down the posting to prevent her from obtaining it. (JA 729-31.) Nickens suspected that Knight's objection to her obtaining the job was due to her relationship with Beasley, and when she confronted him with her theory, he did not deny it but only responded, "[t]here won't be another job posted." (JA 729.) Nickens complained to her co-workers about this incident but did not report it to any other supervisor. Similarly, Nickens believed that Spivey, her group leader, had taken down a job posting on which she had listed her name because he wanted to

"outcast[]" her for associating with Beasley. (JA 872, 885). Nickens claims that eventually the job was re-posted because she complained to the union

## D.    District court opinion

The district court granted summary judgment against all three Plaintiffs. *Barrett v. Whirlpool Corp.*, 543 F. Supp. 2d 812 (M.D. Tenn. 2008). As to Barrett, the court held that her Title VII hostile work environment claim was time-barred because no alleged incident of discrimination took place within the 300 days prior to her EEOC filing, and one event taking place after her EEOC filing did not revive the prior incidents. Likewise, her Title VII retaliation claim was barred because the only specific incidents she alleged fell outside the limitations period. The district court found that her § 1981 claim was not time-barred and, reaching the merits of that claim, found that Barrett had not shown a sufficient level of association with black co-workers to sustain an associational discrimination claim; rather, she had merely shown that she was friendly with some African-American co-workers while at work. The court did not reach the question of whether Barrett had made a sufficient showing of advocacy on behalf of her African-American colleagues to support a third-party discrimination claim because it found that the harassment Barrett alleged was not "severe and pervasive . . . under any circumstances," but instead was sporadic, isolated, and not directed at Barrett. *Id.* at 826.

As to Melton, the court found that she also failed to show association with black employees that rose above the level of workplace collegiality. Again, the court did not reach the question of advocacy because it found that the harassment alleged by Melton did not create a sufficiently hostile work environment. The court found that Melton could not establish a prima facie case of retaliation because she provided no evidence of a causal connection between her acts opposing discrimination and her alleged adverse treatment by Whirlpool.

As to Nickens, the court similarly found insufficient evidence of association, insufficiently "severe and pervasive" incidents of alleged harassment, and a lack of causation with respect to her retaliation claim.

## II. ANALYSIS

### A.    Hostile work environment and retaliation standards

#### 1.    *Standard of review*

We review a grant of summary judgment de novo. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006). The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). Summary judgment is not appropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 251-52.

#### 2.    *Statute of limitations*

There is a question of timeliness only as to Barrett. A claim under Title VII is timely if filed within 300 days of any single act contributing to the hostile work environment. *See* 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Barrett's claims were untimely for Title VII purposes because she did not allege any specific incident of harassment or retaliation within the limitations period. In her deposition, she stated that she has not experienced "any issues regarding race" since 2002 or 2003. (JA 549.) She stated that she never heard any racist slur at Whirlpool other than the specific instances she recounted in her deposition, the most recent of which occurred outside the limitations period. On the other hand, Barrett's § 1981 hostile work environment claim, to which a four-year statute of limitations applies, is timely. 28 U.S.C. § 1658(a).

3.     *Discrimination against otherwise unprotected employees based on association with and advocacy for protected employees*

Title VII forbids employers from discriminating against any individual with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's . . race." 42 U.S.C. § 2000e-2(a). Here, Plaintiffs are not members of the protected class but claim they were discriminated against because they were friends with and spoke out on behalf of their African-American co-workers. Title VII forbids discrimination on the basis of association with or advocacy for a protected party. *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) (association); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (advocacy). Plaintiffs also bring claims under § 1981, which guarantees that "[a]ll persons . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. Section 1981 also prohibits discrimination based on association with or advocacy for non-whites, and we review § 1981 claims under the same standard as Title VII claims. *See Johnson*, 215 F.3d at 573 n.5, 574-75.

a.     *Discrimination based on association*

Title VII protects individuals who, though not members of a protected class, are "victims of discriminatory animus toward [protected] third persons with whom the individuals associate." *Tetro*, 173 F.3d at 994. In *Tetro*, we held that a white parent stated a viable claim under Title VII when his employer took adverse actions against him after learning that his daughter was bi-racial. *Id.* Although Title VII's language states that an individual shall not be discriminated against "because of *such individual's* race," we held that the discrimination against Tetro was based on *his* race because the difference between his race and his daughter's was a cause of the discrimination: "[a] white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child." *Id.*; *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d

Cir. 2008) ("[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race."); *Troy v. Suburban Mgmt. Corp.*, No. 89-1282, 1990 U.S. App. LEXIS 11901, at *13 n.5 (6th Cir. July 13, 1990) ("'Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.'") (quoting *Parr v. Woodmen of World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986)). Courts have construed Title VII broadly in this context to accord with Congress's stated purpose of ending racial discrimination in the workplace. *See Tetro*, 173 F.3d at 994; *Parr*, 791 F.2d at 892.

Here, the district court found an insufficient degree of association between Plaintiffs and members of the protected class to entitle Plaintiffs to the protections of Title VII. While the district court correctly read *Tetro* to state that "a white Title VII plaintiff must demonstrate an association with a member of a protected class, . . . [but] that relationship need not necessarily be familial or intimate," the district court then went on to conclude, without supporting authority, that Plaintiffs' associations with their black co-workers fell short because Plaintiffs provided no evidence that their friendships "constituted anything other than the casual, friendly relationships that commonly develop among co-workers but that tend to be limited to the workplace." *Barrett*, 543 F. Supp. 2d at 826. Although this Circuit has not addressed the degree of association required for non-members of a protected class to bring suit under Title VII, the Seventh Circuit has held, contrary to the district court, that the degree of association is irrelevant, and that "the key inquiries should be whether the employee has been discriminated against and whether that discrimination was 'because of' the employee's race." *Drake v. 3M*, 134 F.3d 878, 884 (7th Cir. 1998) (holding that a white employee may sue under Title VII for discrimination against him resulting from his friendship with black co-workers).

Whirlpool contends that only a significant association—one that extends outside of the workplace—can give rise to an associational Title VII violation against a white employee. It is true that in many of the cases that have found actionable associational

discrimination, the relationship at issue has been one that extended outside the place of employment, such as a familial or romantic relationship. *See, e.g.*, *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998), *vacated in part on other grounds by Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) (interracial dating); *Tetro*, 173 F.3d at 988 (interracial parent-child relationship); *Parr*, 791 F.2d at 892 (interracial marriage). But these cases have not specifically relied on the degree of the association, and other courts have held that a variety of types of association entitle a victim of discrimination to bring suit under Title VII. *See Drake*, 134 F.3d at 878 (friendship with protected employees); *Reiter v. Ctr. Consol. Sch. Dist.*, 618 F. Supp. 1458, 1460 (D. Colo. 1985) (association with Hispanic community); *Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975) (casual social relationship with African-American non-employee); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004) (recognizing that discrimination directed specifically at interracial friendships in the workplace is impermissible under Title VII).

We adopt the sound reasoning of *Drake*: If a plaintiff shows that 1) she was discriminated against at work 2) because she associated with members of a protected class, then the degree of the association is irrelevant. *Drake*, 134 F.3d at 884. The absence of a relationship outside of work should not immunize the conduct of harassers who target an employee because she associates with African-American co-workers. While one might expect the degree of an association to correlate with the likelihood of severe or pervasive discrimination on the basis of that association—for example, a non-protected employee who is married to a protected individual may be more likely to experience associational harassment than one who is merely friends with a protected individual—that goes to the question of whether the plaintiff has established a hostile work environment, not whether he is eligible for the protections of Title VII in the first place. Therefore, we conclude that the district court erred in requiring a certain degree of association before a non-protected employee may assert a viable claim under Title VII.

### *b*     *Discrimination based on advocacy*

Individuals are also protected under Title VII from discrimination because of their advocacy on behalf of protected class members. *See Johnson*, 215 F.3d at 575. In *Johnson*, the plaintiff stated a viable cause of action under Title VII by alleging that he was discriminated against, not on the basis of his own race, but because he advocated affirmative action policies intended to benefit female and minority employees. *Id.* at 576. In *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977), this Court addressed "whether or not [a] white plaintiff . . has standing to sue his former employer under § 1981 for discharging him in alleged retaliation for plaintiff's protesting the alleged discriminatory firing of a black co-worker . . ." We held that the plaintiff had standing because although he "was not fired because of his race, it was a racial situation in which he became involved that resulted in his discharge from his employment." *Id.* at 1268; *see also Johnson*, 215 F.3d at 587, Kennedy, J., *concurring in part and dissenting in part* ("I agree with the majority that individuals are permitted to pursue claims of discrimination based on their advocacy of . . . specific individuals whose constitutional rights or Title VII rights have been violated.").

In this case, the district court did not resolve whether Plaintiffs were able to show that they had acted as advocates for their black co-workers because the court found that they had failed to establish an objectively hostile work environment. As with the question of association, the key questions are whether Plaintiffs were discriminated against, and whether the reason for the discrimination was their advocacy for protected employees. *Cf. Drake*, 134 F.3d at 884. And, as with association, severe or pervasive discriminatory harassment is more likely to correlate with more vigorous advocacy, but as long as a plaintiff offers proof that she was, in fact, discriminated against *because* she advocated for protected employees, she may state a discrimination claim under Title VII. *See Johnson*, 215 F.3d at 575; *cf. Crawford v. Metro Gov't of Nashville & Davidson County, Tenn.*, __ U.S. __, 172 L.Ed.2d 650, No. 06-1595, 2009 U.S. LEXIS 870, at *7-11 (Jan. 26, 2009) (overruling Sixth Circuit decision that retaliation is not actionable under Title VII unless the employee's opposition was "active" and "consistent").

Discriminatory harassment is impermissible whether it is based on the victim's association with protected employees or on the victim's advocacy for protected employees; both types of harassment contribute to a hostile work environment. Therefore, we consider instances of both types of impermissible harassment in the aggregate to determine whether they were so severe or pervasive as to be actionable under the established hostile work environment standard.

### 4     *Hostile work environment standard*

Title VII offers employees protection from a "workplace [] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview . . . [l]ikewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21-22; *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("[C]onduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." (citation and quotation marks omitted)).

The district court described the relevant standard as severe "and" pervasive, not severe "or" pervasive. (JA 260-61, 265, 271). However, "severe or pervasive" is properly considered in the disjunctive. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (noting that the Supreme Court has chosen to use this phrase in the disjunctive); *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 435 (5th Cir. 2005) (requiring conduct to be both severe *and* pervasive would impose an overly heavy burden on plaintiffs).

To defeat a motion for summary judgment in a discrimination case, a plaintiff must adduce direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence is evidence that, if believed, dictates a finding, with no need to draw inferences, that "unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006).

Where a plaintiff relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To establish a prima facie case of a racially hostile work environment, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). A plaintiff, though not within a protected class, may satisfy the first prong of this test based on her association with or advocacy on behalf of protected employees. By introducing evidence that she was subjected to unwelcome racial comments as a result of her association with or advocacy for protected employees, a plaintiff satisfies the second and third prongs.

To assess the fourth prong of an asserted prima facie case, we must examine the totality of the circumstances. *Harris*, 510 U.S. at 23; *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). In doing so, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Williams v. GMC*, 187 F.3d 553, 560-62 (6th Cir. 1999). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions

of employment." *Id.* (internal citation and quotation marks omitted). We do not limit our analysis to the narrow set of incidents directed at the plaintiff or occurring in the plaintiff's presence, *Jackson v. Quanex*, 191 F.3d at 660, but comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile, *see Hawkins*, 517 F.3d at 335-37 (similar acts of harassment occurring outside of plaintiff's presence may be evidence of hostile work environment if plaintiff was aware of them during her employment) (citing cases); *Abeita v. TransAmerica Mailings*, 159 F.3d 246, 249 n.4 (6th Cir. 1998) (instances of harassment of other employees irrelevant if "there is no evidence that plaintiff was aware" of them).

    In assessing the fourth prong in this case, we cannot treat all incidents of harassment of African-Americans as contributing to a hostile work environment; rather, only harassment that was directed toward Plaintiffs themselves or toward others who associated with or advocated on behalf of African-American employees is relevant to our analysis, and only to the extent that Plaintiffs were aware of it. *See, e.g., Bermudez v. TRC Holdings*, 138 F.3d 1176, 1180 (7th Cir. 1998) (in a third-party discrimination case, only acts of discrimination against the third party are actionable—a white plaintiff may not sue simply based on discomfit or "unease at observing wrongs perpetrated against others"); *cf. RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1055 (9th Cir. 2002) ("A white plaintiff generally does not have standing under Section 1983 solely for the purpose of vindicating the rights of minorities . . . [b]ut plaintiffs who are not members of the protected class have standing to challenge racially discriminatory conduct in their own right when they are the direct target of the discrimination.") (citation and quotation marks omitted); *Blanks v. Lockheed Martin Corp.*, 568 F. Supp. 2d 740, 744 (S.D. Miss. 2007) (collecting cases in which white plaintiffs have been permitted to sue under Title VII and § 1981 based on the loss of the benefit of interracial association in the workplace). In other words, only harassment that specifically targeted those who associated with and advocated for African-Americans will result in an actionable hostile work environment claim for such individuals.

To satisfy the fifth prong of the prima facie case, employer liability, what a plaintiff must show differs depending on whether the harassment was carried out by co-workers or supervisors. Employer liability for co-worker harassment stems directly from the employer's actions, or lack thereof, in response to the harassment: The plaintiff must show that the employer "'knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action.'" *Hafford*, 183 F.3d at 513 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 n.11 (6th Cir. 1994)). In contrast, employers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment. *Id.* However, an employer can raise an affirmative defense to liability for supervisor harassment by establishing: (1) that it exercised reasonable care to prevent and correct promptly any racially harassing behavior by its supervisor, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the harm. *See id.* (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)).

### 5      *Retaliation standard*

Title VII protects employees from retaliation for having opposed an employer's unlawful actions. 42 U.S.C. § 2000e-3(a). A plaintiff must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII. *See Johnson*, 215 F.3d at 579. An employee has engaged in opposing activity when she complains about unlawful practices to a manager, the union, or other employees. *Id.* at 579-80. Retaliatory harassment by a supervisor is actionable in a Title VII case. *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000).

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected

activity and the adverse employment action. *See Morris*, 201 F.3d at 792; *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999). In response to allegations of retaliation by a supervisor, the employer may assert the same affirmative defense that is available to hostile work environment claims. *Morris*, 201 F.3d at 793. In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action. *See Allen*, 165 F.3d at 413.

**B.      Application of standards to Plaintiffs' claims**

> *1      Barrett failed to establish a triable issue of fact on her hostile work
> environment claim*

Of the discriminatory comments and acts that Barrett claims she witnessed in her time at Whirlpool, few were directed at her or toward those who associated with or advocated for African-Americans; rather, they were harassing toward African-Americans themselves. Barrett testified that she heard three racist epithets used at Whirlpool, all by Travis. (After her deposition and after Whirlpool had moved for summary judgment, Barrett swore in an affidavit that she heard the word "nigger" on a regular basis at the plant, but such statements, which contradict her prior deposition testimony, do not create a genuine issue of material fact at the summary judgment phase. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). Barrett testified that she saw several instances of racist graffiti and heard an offensive comment about "James Earl Ray Day;" while these, and the remarks by Travis, were highly offensive toward African-Americans, and while two of the comments referred specifically to friends of Barrett's, none of them was directly harassing toward Barrett. Barrett reported nearly all of the racist incidents she witnessed but, other than one reaction from Travis, suffered no adverse consequences for doing so.

Barrett alleges several instances of harassment that were directed toward herself. First, Travis called Barrett a "bitch" and warned her to "mind [her] own business," (JA 825-26), after she confronted him about a racist comment. This constituted direct

harassment of Barrett based on her advocacy on behalf of a protected co-worker. Second, Barrett claims that her former supervisor, Beam, directed desirable work away from Barrett because of Barrett's friendship with Majors. While this allegation is serious, there is little evidence to support it: Beam never made any comment or statement that could substantiate Barrett's perceptions of Beam's animus toward Majors, Majors herself contradicted Barrett's claims that Beam treated Majors poorly, and Barrett introduced no evidence other than her own impressions that Beam directed desirable work away from her. Third, Barrett claims that she received the "cold shoulder" from three Caucasian employees when she worked on the assembly line and that her group leader would ignore her requests for materials she needed in the course of her work because she was friendly with African-American employees. While such conduct could contribute to a finding of a hostile work environment, and while it allegedly resulted from Barrett's friendliness toward African-Americans, it is not, on its own, objectively severe conduct. *Cf. Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 716 (3d Cir. 1997) ("mute gestures" such as squinting and shaking one's fists "cannot itself be characterized as particularly severe"). For example, no one on the assembly line ever actually said that they disapproved of Barrett's interactions with black co-workers.

Barrett made a number of comments suggesting that she did not view her work environment as particularly hostile, including that she was never told and did not feel she had to conform or act in a certain way toward African-American co-workers. She admitted in 2006 that she had not "had any issues regarding race or people's conduct or attitudes towards [her] since" 2002 or 2003. (JA 549.) Upon consideration of the totality of the circumstances, the single comment from Travis, the perceived diversion of desirable work by Beam, and the receipt of the "cold shoulder" from a few co-workers is insufficient evidence of severe or pervasive harassment to allow a reasonable jury to find that Barrett was subjected to a hostile work environment. And, as discussed above, Barrett's retaliation claim is untimely

### 2     *Melton failed to establish a triable issue of fact as to her hostile work environment and retaliation claims*

As with Barrett, most of the comments and other instances of racism cited by Melton were not related to her association with or advocacy for black employees. Melton often overheard several employees use the word "nigger" at work, but, offensive as it may be, this does not suggest discrimination toward or harassment of Melton herself. Similarly, a Caucasian employee asked Melton how she could "stand the smell" of an African-American friend of Melton's. Although this comment deeply offended Melton, it was primarily directed toward Melton's friend, and it does not, on its face, suggest any intent to discriminate against or harass Melton herself. It provides, at best, only weak evidence of harassment based upon Melton's association with her protected co-worker. Melton asserts that the comments Travis made about the Ku Klux Klan are discriminatory to whites because the Ku Klux Klan often targets whites who sympathize with blacks. While there is some logic to this, blacks are, of course, the primary targets and victims of the Ku Klux Klan, and there is no evidence suggesting that the graffiti and comments pertaining to the Ku Klux Klan at Whirlpool were intended to threaten white employees.

On the other hand, Melton knew that some employees at Whirlpool used the term "nigger lover." This term, on its face, constitutes racial harassment of employees who associate with or advocate for African-Americans. However, Melton never heard a manager or supervisor use the term "nigger lover," she was ambiguous about whether she had ever actually heard the term used by a non-supervisor, and she implied that she had never heard it used in reference to herself. Her awareness that the term was used at Whirlpool contributes to a finding of a hostile work environment, though less so than if the evidence had established that she was subjected to the term herself. Melton also claims that two supervisors became angry with her for accompanying black co-workers to the medical office when they were injured, but she offers no evidence to support her claim that their anger was racially motivated.

Melton makes a general claim that "[t]he ones that defended the black people
. . . didn't get by with anything [and] had to stay on their toes," (JA 972), but she fails
to provide any evidence to support this claim. Melton claims that unspecified employees
in the halls at work gave her odd looks or passed her without saying hello because she
was friendly with African-American co-workers, but the harassment, as Melton has
alleged it, was neither severe nor pervasive. Melton does not allege hearing a single
remark that reflects discrimination directly toward her as a result of her associations with
or advocacy on behalf of blacks. She has not offered sufficient evidence to establish a
prima facie case of a hostile work environment.

Melton also fails to offer evidence in support of her retaliation claim. She alleges
that she received unfavorable treatment upon returning to work after undergoing
surgeries. But Melton only guesses that human resources employee Fred Contreras was
responsible for her treatment; she only guesses that his decision was based on her
"defending" certain employees (in a manner she does not adequately explain); and she
only guesses that what Contreras, who is Hispanic, found objectionable about Melton's
conduct was the fact that many of the employees she allegedly defended belonged to
protected groups. *See Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1984) (conclusory
statements, subjective beliefs, or intuition cannot defeat summary judgment). The
district court correctly found that Melton failed to offer any evidence of a causal
connection between her various advocacy activities and her reassignment and layoff
following surgery.

### 3    *Nickens established a genuine issue of material fact as to hostile work environment but not retaliation*

As with Barrett and Melton, many of the racist comments Nickens heard, such
as two racist jokes and the regular use of the word "nigger," do not support her claim that
*she* was discriminated against. However, more than Barrett and Melton, Nickens was
the victim of direct harassment resulting from her associations with black employees.

Nickens complained about Travis's racist language, and after he was fired, Travis
allegedly caused a threat of physical violence to be relayed to Nickens by two co-

workers. Nickens complained to her supervisor and the union about this threat and alleges that she was deeply frightened by it. Nickens's co-workers, Spivey, Hibdon, Goins, and Cregger, as well as a supervisor, Knight, frequently made racially derogatory comments criticizing her association with Beasley. Nickens complained to Knight regularly about these comments, and he refused to take any action. Nickens also felt that her African-American supervisor, Bingham, harassed her because of her relationships with black employees. Nickens alleges two instances in which a supervisor and a co-worker attempted to prevent her from applying for job advancements because of their disapproval of her friendship with Beasley.

Nickens also alleges that in 1988, a white employee named Jim Jones grabbed her around the neck and said he did not think she should be "hanging around any niggers." (JA 698.) The factual circumstances of the incident are unclear from the record, and while it may be considered as "background evidence," it is too far removed in time from the other incidents alleged by Nickens to be part of "the same actionable hostile work environment practice" at issue here. *See Morgan*, 536 U.S. at 120.

The district court erred in granting summary judgment against Nickens. While Whirlpool contests the facts surrounding many of her allegations, a reasonable jury could find that Nickens was subjected to a severe or pervasive hostile work environment that altered the conditions of her employment: she received a threat of physical violence for reporting racist language, she was subjected to a regular stream of offensive comments about her relationship with an African-American co-worker, and the same relationship was allegedly used as a reason to prevent her from applying for improved job positions. Nickens has alleged facts giving rise to Whirlpool's liability in that she reported nearly all of the relevant incidents involving co-worker harassment to one of two supervisors, Bingham and Knight, and they failed to take corrective action. Furthermore, Nickens has alleged that both of these supervisors, particularly Knight, harassed her directly.

Nickens has not established a claim for retaliation, as the bulk of the instances of discrimination and harassment against her were based on her association with black employees, not on opposition to any unlawful conduct. *Cf. Moore v. City of*

*Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) ("With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII."). Nickens argues that Whirlpool's actions would have dissuaded a reasonable worker from making a complaint of discrimination, but none of the alleged acts of harassment, other than Travis's relayed comment, was in response to her opposition to discrimination. Nickens cannot establish that her oppositional activity was causally connected to any tangible adverse employment action.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision in all respects, except as to Plaintiff Nickens's hostile work environment claim. As to that claim, we **REVERSE** and **REMAND** for trial.